*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 26, 2021

Plaintiff-Appellee,

v

No. 349461
Oakland County Circuit Court
LC No. 2018-267828-FH

MARVIN ANTOIN AINSWORTH-DAVIS,

Defendant-Appellant.

Before: RIORDAN, P.J., and MARKEY and SWARTZLE, JJ.

PER CURIAM.

Defendant Marvin Antoin Ainsworth-Davis appeals as of right his jury trial convictions of first-degree home invasion, MCL 750.110(a)(2), and unlawful imprisonment, MCL 750.349.[1] He was sentenced as a fourth habitual offender, MCL 769.12, to serve concurrent terms of 25 years to 60 years for first-degree home invasion, 19 to 60 years for unlawful imprisonment, and lesser terms for the two remaining convictions. On appeal, defendant argues that the trial court erred when it admitted consciousness of guilt evidence despite the evidence having an unfair danger of prejudice which substantially outweighed any probative value under MRE 403. Alternatively, defendant argues that there was insufficient evidence to support the verdict of first-degree home invasion, where the complainant gave contradictory testimony regarding whether she provided defendant with a key to her home. We disagree and affirm.

## I. FACTS AND PROCEDINGS

This case arises out of a November 29, 2017 incident between defendant and his ex-girlfriend, C.C. C.C. testified that on November 29, 2017, she lived in Farmington Hills. Defendant was an ex-boyfriend whom she had known since July 2016.

---

[1] Defendant also was convicted of aggravated assault (domestic violence), MCL 750.81(a)(2), and assault and battery, MCL 750.81, but expressly limits his appeal to the convictions of first-degree home invasion and unlawful imprisonment.

C.C. testified that on several occasions, she would break up with defendant, but he would be "just persistent on trying to get me back to date him again." When she would break up with him, defendant would call, text, and "want another chance." C.C. acknowledged that she resumed dating him on several occasions after breaking up with him. However, C.C. testified that she broke up with defendant on November 17, 2019, a couple of weeks before the incident on November 29, 2017, and that the two remained broken up through that date.

C.C. was asked to recall her day on November 29, 2017, and she testified that she returned to her home after lunch at about 1:30 or 2:00 p.m. She parked her car on the side of her home and entered through the side door. C.C. testified that when she walked in her side door, she noticed a coat on the ground and bent down to pick it up. As she did this, she heard fast footsteps coming towards her and felt herself being grabbed by defendant. C.C. explained that defendant grabbed her by the neck with both hands and tried to restrain her from fighting or yelling. Defendant told her multiple times to "shut up" and eventually punched C.C. in the face, causing her eye to instantly swell. Defendant then slammed the side door shut and forced C.C. to sit down in her kitchen so that he could tie her up.

Defendant then asked to go through C.C.'s phone to see if she had texts from other men. After defendant demanded it, C.C. unlocked her phone and gave it to defendant. When he saw that she had been talking with other men, defendant smacked her, choked her, pulled her hair, and taped her up again with her hands behind her back. Defendant eventually stopped choking C.C. and she was able to breathe again.

C.C. testified that later in the night, defendant attempted to initiate sex, but she told him that she was not feeling well, that her head hurt, and that she did not feel like having sex but would try. After defendant indicated that sex might calm him down, C.C. decided to have sex with him. Defendant eventually became intoxicated and fell asleep. C.C. was exhausted and eventually fell asleep as well.

C.C. woke up before defendant early in the morning, snuck out of the home, and drove directly to the Farmington Hills Police Station. After she told police officers what happened, she was taken to Beaumont Hospital and diagnosed with an orbital fracture on her face.

C.C. was interviewed by Farmington Hills Police Detective Joe Mertes. At trial, Detective Mertes testified that he asked C.C. if defendant had permission to be in her home, and she indicated that he did not and denied ever giving him a key. C.C. did not tell Detective Mertes that she and defendant continued speaking after breaking up.

Defendant was interviewed by Farmington Hills Police Detective Scott Rzeppa in the emergency room at Botsford Hospital. Detective Rzeppa testified that defendant acknowledged during the interview that at the time of the incident in question, the two were not dating. Moreover, defendant said that C.C. had given him a key to her home a while back when he had done some work inside. He said that C.C. had never asked him to return the key. Defendant indicated that he did not think that he had permission to be in C.C.'s home and that if she had known he was there, it probably would have resulted in an argument.

C.C. maintained that she had never given defendant a key and that defendant did not have permission to be in her home after the two had broken up on November 17, 2017. She also texted him asking for the key's return, if he had one.

After defendant was arrested, he started contacting C.C. by phone and asked her not to write a statement against him. He contacted her many more times about not prosecuting him, and the calls continued throughout the year. Defendant also had other inmates, his parents, and his aunt call C.C. In this regard, Farmington Hills Detective Nathan Jordan testified that he listened to approximately 78 phone calls made by defendant from the Oakland County Jail. He explained that "55 of them involved the Defendant contacting the victim directly or speaking to his mother or his father, and either asking the victim directly to not come to trial and not to testify against him, or asking his mother and father to intercede on his behalf, contact the victim and ask her not to come to trial." The prosecution then played incriminating excerpts of several of the phone calls for the jury.[2]

The evidence that defendant attempted to prevent C.C. from appearing in court was considered before trial. The prosecution moved in limine to admit these phone calls against defendant as "consciousness of guilt." At the motion hearing, the prosecution identified seven or eight phone calls that it wanted to use at trial to be offered as evidence of consciousness of guilt. The trial court admitted the evidence and ruled as follows:

---

[2] Most of the phone calls are between defendant and C.C. and somehow involve defendant asking C.C. for a "pass" or otherwise saying that she should stop pursuing the charges, but one conversation between defendant and an unidentified adult male is particularly incriminating:

Defendant: There's three motherfucking charges bro. That wasn't even that. Only thing I'm, like I don't wanna do too much talking on this bitch-ass phone. Only thing I did was domestic violence, that's the only thing I'm guilty of, whooping her mother-fucking ass. All-

* * *

Defendant: I-, I honest to God I ain't do shit I beat her ass that was it. I beat her ass I beat the fuck out of her. I ain't beat the fuck out of her bad. I prob hit her one time her shit swolled up. Then I grabbed her around her neck that was it.

* * *

Defendant: I don't know man. I . . . she ain't that type of bitch for real she just like shook up behind that shit. She really ain't that type of bitch man but, shit nigger you could call and offer her to send her and her kids on a motherfucking Disney Cruise or something. Gotta get her the fuck out the way.

So, having -- I have had taken [sic] the opportunity to review the pleadings in this matter and now hear your oral arguments. And I do believe that the prosecutor is entitled to introduce the phone calls on the theory of consciousness of guilt. And while they are prejudicial, they are clearly not more prejudicial than probative as to these issues.

It's a monumental effort that Mr. Ainsworth went through over the course of the last year or so to not get this witness to testify; phone calls to the witness, phone calls to family members, getting his mother to go over to the house and look in the windows. I mean, it was above and beyond, quite frankly, any case I've ever seen before. And under those circumstances, I will give you a preliminary ruling on the -- on the forfeiture by wrongdoing. If there was ever a case where it would be appropriate, it would be this one.

And if he has managed, over the course of the last year, to intimidate this witness to the point that she refuses to come in and testify on Monday, then I will allow her statements to the police to be brought in.

As discussed, the jury found defendant guilty of first-degree home invasion, unlawful imprisonment, and aggravated assault. It also found defendant guilty of the lesser offense of assault and battery with regard to an assault by strangulation charge. Defendant now appeals.

## II. DISCUSSION

## A. CONSCIOUSNESS OF GUILT

Defendant argues that the trial court erred when it admitted the phone calls as evidence of consciousness of guilt. We disagree. "The decision whether evidence is admissible is within the trial court's discretion and should only be reversed where there is a clear abuse of discretion." *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998).

This Court has repeatedly held that when a defendant attempts to dissuade a witness from testifying, his actions are both relevant and admissible to demonstrate a consciousness of guilt. In *People v Hooper*, 50 Mich App 186; 212 NW2d 786 (1973),[3] this Court considered the admission of testimony by the complaining witness that the defendant had asked the witness to drop the charges, or alternatively, to lie at trial. *Id*. at 198-199. On appeal, the defendant argued that this testimony put before the jury evidence of two additional offenses. *Id*. This Court agreed, but upheld the admission of the evidence as proper, citing the grounds for its admissibility found in 2 Wigmore, Evidence (3d ed), § 278, p 120:

---

[3] While published opinions of this Court decided before November 1, 1990, are not binding, MCR 7.215(J)(1), "they are nevertheless precedential, MCR 7.215(C)(2), and they are thus afforded significantly more deference than would be given to unpublished cases." *People v Spaulding*, 332 Mich App 638, 657 n 5; 957 NW2d 843 (2020).

It has always been understood–the inference, indeed, is one of the simplest in human experience–that a party's Falsehood or Other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit.

In determining that the testimony was proper evidence for the jury to consider, *Hooper* also noted a prior ruling in *People v Casper*, 25 Mich App 1, 7; 180 NW2d 906 (1970), which stated: "Michigan authority appears uniform in holding that actions by the defendant such as flight to avoid lawful arrest, procuring perjured testimony and attempts to destroy evidence, while possible as consistent with innocence as with guilt, may be considered by the jury as evidence of guilt." See also *People v Kowalski*, 489 Mich 488, 509 n 37; 803 NW2d 200 (2011) (observing that attempts to conceal evidence are admissible to show consciousness of guilt); *People v Schaw*, 288 Mich App 231, 237; 791 NW2d 743 (2010) ("Evidence that a defendant made efforts to influence an adverse witness is relevant if it shows consciousness of guilt."); *People v Kelly*, 231 Mich App 627, 640; 588 NW2d 480 (1998) ("Evidence of a defendant's threat against a witness is generally admissible as conduct that can demonstrate consciousness of guilt.").

In this case, the evidence that defendant repeatedly tried to persuade C.C. to refuse to testify or otherwise abandon the criminal charges against him was highly relevant to show his consciousness of guilt with regard to the events in question. That is, the evidence tended to show that defendant was aware that he had committed serious criminal conduct and that he would accordingly be in danger of imprisonment if C.C. continued to reiterate her story. The evidence plainly fits within the rule articulated in cases such as *Hooper* and *Casper* that attempts to suppress unfavorable witness testimony are relevant and admissible to show consciousness of guilt. See MRE 401; MRE 402.

Defendant attempts to distance the facts of his situation from these prior cases by arguing that such cases typically involve a single charge where the danger of confusion for the jury was non-existent. According to defendant, in a case with multiple charges and an even greater number of elements, the "guilt" cannot be assigned to a particular element or charge. Defendant characterizes this as an ambiguous cloud of insinuation that serves no purpose but to prejudice the jury, thus violating MRE 403.[4] Defendant reasons the consciousness of guilt evidence in this case does not make it more or less likely that he entered the home without permission. Rather, the evidence merely suggests that defendant knew that he did something wrong, which was assaulting C.C.

---

[4] MRE 403 provides as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We are aware of no case in which consciousness of guilt evidence was properly excluded merely because the defendant was charged with multiple offenses with dissimilar elements. Defendant suggests that because there was potential contradictory evidence regarding whether he had been given a key to the home, the consciousness of guilt evidence could be used to unfairly persuade the jury to find him guilty and should therefore be barred. But defendant himself admits that this consciousness of guilt evidence shows that he knows that he did something wrong. Defendant's argument that because he admits to assaulting C.C., the consciousness of guilt evidence should only be applied to those charges he admits to, as opposed to the more serious charges he contests, lacks any merit.

In the present case, defendant appeared to know that the evidence against him was overwhelming and believed that his only way to escape liability would be to convince C.C. to recant her statements to the police and fail to appear for trial. Defendant violated no-contact orders and repeatedly harassed C.C. directly and through relatives and friends. Accordingly, the trial court did not abuse its discretion by admitting the consciousness of guilt evidence despite the presence of multiple charges against defendant.

## B. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence to support the verdict for first-degree home invasion because C.C. lacked credibility as a witness on the home-invasion charge after repeatedly downplaying her relationship with defendant in interviews with the police and giving contradictory testimony on whether she gave defendant a key to her home. We disagree.

A challenge to the sufficiency of the evidence to support a conviction may be raised for the first time on appeal. *People v Patterson*, 428 Mich 502, 514-515; 410 NW2d 733 (1987). "In sufficiency of the evidence claims, this Court reviews the evidence in the light most favorable to the prosecutor and determines whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt." *People v McKinney*, 258 Mich App 157, 165; 670 NW2d 254 (2003). This Court "will not interfere with the jury's role of determining the weight of the evidence or the credibility of the witness." *Id*. "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Id*. (cleaned up).

First-degree home invasion has "alternative elements" and thus, it "can be committed in several different ways." *People v Wilder*, 485 Mich 35, 43; 780 NW2d 265 (2010). To establish first-degree home invasion, the prosecution must show that the defendant (1) "breaks and enters a dwelling" or "enters a dwelling without permission"; (2) "intends when entering to commit a felony, larceny, or assault in the dwelling" or "at any time while entering, present in, or exiting the dwelling commits a felony, larceny, or assault"; and (3) "is armed with a dangerous weapon" or "[a]nother person is lawfully present in the dwelling." *Id*. See also MCL 750.110a(2). Defendant

challenges only the first element, arguing that the prosecution failed to prove beyond a reasonable doubt that he did not have lawful access to the home.[5]

C.C. testified multiple times that defendant did not have permission to enter her home on November 29, 2017. This alone was sufficient to prove the first element of first-degree home invasion beyond a reasonable doubt, where defendant did not otherwise have a legal right to enter her home without her permission. Even if C.C. had given defendant a key months earlier, there is no evidence that he had implicit or explicit permission to use it on November 29, 2017, after C.C. broke up with him a couple of weeks earlier. To the contrary, the text messages C.C. sent to defendant insinuating that she had previously given him a key showed that she wanted her key back, as they said, "I want my key" and "Bring me my key." Thus, the mere fact that defendant may have had a key on the day in question does not show that he had permission to enter her home on November 29, 2017.

Defendant's argument challenging the veracity of C.C.'s testimony that he lacked permission to enter the home goes to the credibility of the witness and the weight of the evidence. The determination of witness credibility is the function of the jury and not of this Court. *People v Wolfe*, 440 Mich 508, 514-516; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992); *People v McFall*, 224 Mich App 403, 412; 569 NW2d 828 (1997). Questioning her credibility does not establish a basis for reversal.

The evidence presented in this case, when viewed in the light most favorable to the prosecution, was sufficient to allow a rational jury to find beyond a reasonable doubt that defendant unlawfully invaded C.C.'s home on November 29, 2017 and was therefore guilty of first-degree home invasion.

III. CONCLUSION

The trial court did not abuse its discretion by admitting the consciousness of guilt evidence against the defendant, and there was sufficient evidence for a rational jury to find beyond a reasonable doubt that defendant was guilty of first-degree home invasion. Accordingly, we affirm.

/s/ Michael J. Riordan
/s/ Jane E. Markey
/s/ Brock A. Swartzle

---

[5] Defendant does not dispute that he assaulted C.C. when she was lawfully present in her home, which satisfies the second and third elements of first-degree home invasion.